NOTICE
Decision filed 08/04/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 230151-U

NO. 5-23-0151

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Wabash County. |
| | ) | |
| v. | ) | No. 19-CF-98 |
| | ) | |
| JEFFERY L. ISHAM, | ) | Honorable |
| | ) | William C. Hudson, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE VAUGHAN delivered the judgment of the court.
Justice Barberis concurred in the judgment.
Presiding Justice McHaney dissented.

**ORDER**

¶ 1   *Held*: The defendant's conviction and sentence are affirmed where (a) the State proved the defendant guilty of predatory criminal sexual assault of a child beyond a reasonable doubt, (b) the trial court did not violate Illinois Supreme Court Rule 431(b), (c) the defendant did not receive ineffective assistance of counsel, (d) the predatory criminal sexual assault statute does not violate the proportionate penalties clause, and (e) the trial court did not abuse its discretion when it sentenced the defendant to 45 years' imprisonment.

¶ 2   Following a jury trial, the defendant, Jeffery L. Isham, was convicted of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2018)) and was sentenced to 45 years' imprisonment. On appeal, the defendant argues (a) the State failed to prove him guilty of predatory criminal sexual assault of a child beyond a reasonable doubt, (b) the trial court committed plain error by violating Illinois Supreme Court Rule 431(b) (eff. July 1, 2012), (c) defense counsel

1

provided ineffective assistance, (d) the predatory criminal sexual assault statute violates the proportionate penalties clause, and (e) the trial court disproportionately sentenced him to 45 years' imprisonment. For the following reasons, we affirm the defendant's conviction and sentence.

¶ 3                                    I. BACKGROUND

¶ 4     On September 10, 2019, the defendant was charged, by information, with one count of predatory criminal assault of a child, a Class X felony, for an incident that occurred on September 8, 2019, "in that said Defendant, whose date of birth is July 27, 1990, committed an act of contact between his hand and the vagina of a female minor (d.o.b. 06/18/2008), for the purpose of the sexual gratification of the Defendant, and Jane Doe is under thirteen years of age, in violation of 720 ILCS 5/11-1.40(a)(1)." Counsel was subsequently appointed to represent the defendant.

¶ 5     On January 6, 2020, at the defendant's request, the trial court held a Rule 402(d) conference off the record. Ill. S. Ct. R. 402(d) (eff. July 1, 2012). At the conclusion of the conference, the court rejected the proposed plea agreement between the State and the defendant.

¶ 6     On January 10, 2020, the State filed, pursuant to section 115-7.3 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-7.3 (West 2018)), a motion to admit other-crimes evidence pertaining to alleged criminal sexual conduct of the defendant against his three minor children. The State sought the admittance of evidence from the defendant's three children, D.I., R.I., and B.I., who provided similar accounts of being asked by the defendant to place the defendant's penis in their mouths, and from B.I., that the defendant did something to B.I. on more than one occasion since B.I. was five years old, including "SEX." It argued the evidence was "relevant to show identity, intent, lack of consent, identity [*sic*], *modus operandi*, motive, propensity and common scheme or design." A supplement to the motion was filed on July 1, 2020. Defense counsel did not file a response to the motion or the subsequent supplement.

2

¶ 7     On July 29, 2020, the trial court filed its written order granting the motion to admit other-crimes evidence wherein it stated that it considered and found (a) the proximity in time to the charged offense weighed in favor of allowing the evidence, (b) the degree of factual similarity to the charged offense weighed in favor of allowing the evidence, and (c) all other relevant facts and circumstances to the charged offense weighed in favor of allowing the evidence. It ultimately found that "the probative value outweighs the danger of unfair prejudice" and allowed the State "to introduce the evidence of other crimes as set forth in its Motion."

¶ 8     On July 22, 2021, pursuant to section 115-10 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10 (West 2020)), the State filed its notice of intent to offer out-of-court statements that A.I. made to her parents and to a forensic interviewer, Ashleigh Turner. On November 15, 2021, the trial court conducted a hearing on the matter. Defense counsel voiced no objection to the admission of the statements, but asked the court to instruct the jury that it was "for the jury to determine the weight and credibility to be given to the statement[s] after taking into consideration age, maturity and things of that nature that goes on in the statute." The court asked, "And are there any particular statements, or is it the sheriff's report and the Guardian Center forensic interview in whole that you are planning on introducing?" The State indicated that it would introduce the entire interview. Defense counsel confirmed the same.

¶ 9     The jury trial commenced on December 6, 2021. Each of the potential jurors was given a card with a number on it which became their assigned juror number. During *voir dire*, the trial court told the potential jurors as a whole that (a) a defendant is presumed innocent of the charge against him and the State must prove the defendant guilty of the offense beyond a reasonable doubt, (b) the defendant was not required to present evidence on his own behalf, and (c) the defendant

3

"had the right to testify or not" and, if the defendant chose not to testify, the jury could not hold that decision against him. The following colloquy took then place:

"THE COURT: As I ask the following questions, please raise any question or concern you may have as to each of the principles addressed. *** I will ask the question. And then I will ask for an individual response from each of you on these next few questions. Do you understand and accept that the defendant is presumed to be innocent of the charge against him? Is there anyone in the group who does not understand this proposition? Juror number one?

JUROR NO. 1: Oh, I understand.

THE COURT: Do you understand?

JUROR NO. 1: Yes.

THE COURT: All right. Juror number 2:

JUROR NO. 2: I understand.

THE COURT: Indicates yes. Juror number three?

JUROR NO. 3: Yes, sir."

The court questioned the remaining potential jurors in the same manner, by calling their number, without asking any specific question. Each of the potential jurors answered in the affirmative.

¶ 10 Without objection, the State asked the potential jurors, *inter alia*:

"Would anyone here have a difficult time finding a defendant guilty of sexual abuse if there is not medical evidence of that abuse? If you could, raise your number if you would have a difficult time finding a defendant guilty if there is no medical evidence of that abuse."

It also posited:

4

"[D]oes anyone watch any crime shows? Anyone watch 20/20 about crimes? SVU, Special Victim's Unit? CSI? Anyone watch those? If you could, show me your numbers please. Okay. A lot of you. And do you feel it's true that in those shows, a lot of times, they have DNA evidence which is pretty conclusive that this person did this bad act? Do you agree with me that that's the case in a lot of these shows? Would you have, would anyone have, and show me your number if so, difficulty finding a defendant guilty if there is not conclusive DNA evidence of the crime?"

¶ 11    After the jury was chosen, the trial began. In its opening statement, the State asserted, *inter alia*:

"This case is about a family secret. It's a family secret that was kept within Jeffery and Kimberly Isham's immediate family for some time. And that family secret was that the defendant was a child sexual predator that put his sexual desires before his duty to protect children in his care.

And the only reason we're here discussing the secret, the only reason you're going to hear about this secret is because the defendant acted on his sexual impulses and attacked a child that was outside of his immediate family. And that child was [A.I.], age 11, the defendant's niece.

* * *

Now, remember I told you this is about a family secret. I will ask [D.I.], age 13 now, [B.I.], age 10 now, to come in here before you, just like [A.I.], and tell you their experiences with their father. And I expect that they will tell you that he attempted the same things, and he did the same things to them."

¶ 12    The State presented A.I. as its first witness. A.I. testified that she was 13 years old and her birthdate was June 18, 2008. She lived near Allendale in Wabash County, Illinois, and attended Mt. Carmel Junior High School where she was in eighth grade. Her parents were Natalie Isham and Jacky Isham. She had three younger siblings. The defendant was her father's brother. The defendant had three children, D.I., R.I., and B.I., who were A.I.'s cousins. A.I. sometimes spent time with these cousins at either her house or their house in Keensburg, Illinois.

¶ 13    The last time A.I. went to the defendant's house was "like two years ago." Also there at the time were her siblings, her parents, her cousins, the defendant, and the defendant's wife, Kimberly. At some point, A.I.'s parents left for "date night" and left her and her siblings with the defendant, Kimberly, D.I., R.I., and B.I. After a while, Kimberly left the house and went across the street to her father's house. A.I., her siblings, and her cousins were watching television. The defendant was also there in the house.

¶ 14    While A.I. and the other children were watching television, the defendant pulled her by her ponytail into the bathroom. Once they were in the bathroom, the defendant shut the door. He then pulled down his pants and tried to put his penis in her mouth. However, A.I. covered her mouth and told the defendant "no." She was yelling at the time. After A.I. told the defendant "no," he pulled down the back of A.I.'s shorts and underwear and put his finger in her vagina while she was facing forward on the floor. This action scared A.I. The defendant stopped what he was doing when Kimberly opened the door. After that, A.I. went back to the front room where she had earlier been watching television. The other children were all there. A.I. then went outside and Kimberly asked her some questions, which she answered truthfully. After a while, A.I.'s parents came to the defendant and Kimberly's house and picked up her and her siblings. A.I. told her parents what the defendant did to her, and they later took her to the police station.

¶ 15    On cross-examination, A.I. testified that in addition to covering her mouth, she covered her eyes so that she did not see the defendant's privates. She was wearing shorts at the time but remembered having previously said that she wore jeans. Her parents asked her if she had walked in on the defendant while he was in the bathroom. On redirect examination, A.I. testified that Kimberly sent a message to her parents accusing A.I. of walking in on the defendant in the bathroom. She clarified that she was wearing jean shorts at the time of the incident.

¶ 16    Jacky Isham testified that the defendant was his brother. On September 8, 2019, Jacky and Natalie left their children with the defendant and Kimberly at the defendant's house in Keensburg while he and Natalie went out for a date. While they were gone, Kimberly sent Natalie a text that said they needed to pick up their children because A.I. walked in on the defendant while he was in the bathroom. When Jacky and Natalie got to the defendant's house, he saw the defendant "bent down a little bit in his chair" in the front room as if he were sleeping. The defendant did not say anything.

¶ 17    After picking up the children, Jacky asked A.I., "so you walked in on your Uncle Jeffery?" A.I. looked at him with a scared look and almost started crying. Then, A.I. told him what happened earlier. She said that the defendant pulled her by the hair into the bathroom, tried to put his penis in her mouth, then pulled down her pants and "put his finger inside of her." Jacky and Natalie took A.I. to the police station that night.

¶ 18    Dru Faulkner testified that he was employed by the city of Mt. Carmel as a 9-1-1 dispatcher and telecommunicator. He was working from 11 p.m. on September 8, 2019, until 7 a.m. on September 9, 2019. At 12:43 a.m., Jacky and Natalie came in and reported that A.I. had possibly been molested, but did not indicate who they believed was the perpetrator. Mr. Faulkner then informed the deputy on duty that the family was in the lobby.

¶ 19   D-Ray Etzkorn testified that he was a deputy with the Wabash County Sheriff's Department. His duties included taking reports of crimes. On September 9, 2019, he was working in that capacity when he took a report from Jacky and Natalie. Jacky and Natalie reported that their daughter told them she had been molested by her uncle, the defendant. After Deputy Etzkorn took the initial information, it was determined that an investigation should proceed, and the case was handed off to Deputy Keagan Bogard who was a certified sex crime investigator.

¶ 20   Keagan Bogard testified that he was currently employed by the Cookeville Police Department in Tennessee. Prior to this employment, he was employed as a deputy with the Wabash County Sheriff's Department where one of his duties was the investigation of sexual assault cases. On the morning of September 9, 2019, Officer Bogard was assigned the instant case involving the defendant and A.I. After he reviewed the initial report, he contacted the Department of Children and Family Services (DCFS) due to the sexual nature of the abuse. At around 9 a.m., he went to A.I.'s home where Natalie was present. While there, he collected the underwear and blue jean pants that Natalie told him A.I. wore at the time of the incident. The underwear was lying on the bathroom floor, intertwined with the jeans. Officer Bogard later took the underwear to the Illinois State Police crime lab on February 18, 2020. At the time of trial, the jeans remained in the evidence locker where the underwear was also separately stored.

¶ 21   Officer Bogard referred A.I. to a sexual assault evaluation by a sexual assault nurse examiner (SANE) at Carle Richland Memorial Hospital in Olney, Illinois. He did not attend the evaluation. Officer Bogard also referred A.I. to The Guardian Center, a children's advocacy center, in Mt. Carmel, Illinois, for a forensic interview. Natalie took A.I. to The Guardian Center where an interview was conducted in the afternoon of September 9, 2019. Officer Bogard observed the interview from a room separate from the interview room.

¶ 22    Ashleigh Turner testified that she was currently employed as a social emotional behavioral assistant for the Warrick County, Indiana, school district. Prior to that employment, she worked for The Guardian Center as a forensic interviewer. On September 9, 2019, Ms. Turner received a phone call from an investigator at DCFS requesting that an interview with a child be conducted that afternoon. She learned the child's name was A.I., who was 11 years, and that "there had been something that happened the night before." The interview with A.I. took place around 1 p.m. at The Guardian Center in Mt. Carmel. Only Ms. Turner and A.I. were in the room where the interview occurred. However, two other people—Deputy Bogard from the Wabash County Sheriff's Office and Nikki Greathouse from DCFS—observed the interview from a separate room. The interview was recorded. Ms. Turner reviewed the interview recording prior to trial and confirmed that it fairly and accurately portrayed the interview as it was recorded.

¶ 23    Next, the State played a copy of the interview video. When A.I. was asked why she came to talk to Ms. Turner, A.I. stated that the prior night, the defendant pulled her by the hair from the front room into his bathroom, while she tried to hold onto the wall and yelled at him to stop. Inside the bathroom, with the door shut, he pulled down his shorts and tried to put his private in her mouth. When A.I. put her hand over her mouth, the defendant turned her around, pulled down the back of her pants, and put his finger "up my private," which felt "weird" and hurt a little bit. A.I. yelled and told the defendant to stop. A.I.'s cousins, R.I. and B.I., went to get their mother, Kimberly, from "Harold's" house. Eventually, Kimberly opened the bathroom door and told A.I. to get out. Kimberly then took A.I. outside and asked what A.I. and the defendant had been doing. A.I. told her that the defendant dragged her by the hair and put his finger inside her private. A.I. forgot to tell Kimberly about the rest of what happened. Kimberly said, "okay," and went back inside the house.

¶ 24    After Kimberly went inside, B.I. told A.I. that the defendant would have her suck his private, pee in her mouth, and force her to drink it. He would also put his private in B.I.'s butt and private. A.I. told Ms. Turner that she did not know if the defendant did this to B.I. a lot but thought he did "because he lives with her all the time." B.I. looked like she was telling the truth. A.I. thought that Kimberly tried to stop the defendant from doing this to B.I., but he kept doing it.

¶ 25    A.I. clarified that when the defendant grabbed her, she was sitting in the front room watching television with her siblings and two of her cousins, B.I. and R.I. The other children saw the defendant grab A.I. and heard her screaming. R.I. and B.I. ran to Harold's house to get Kimberly.

¶ 26    Following the playing of the video, Ms. Turner then returned to the witness stand. When the State asked if she was in the courtroom when her interview with A.I. was played, Ms. Turner answered in the affirmative. She again answered in the affirmative when asked if the video was an accurate depiction of the interview, the questions asked, and the answers given. The State then moved to admit the video. The court granted the request with no objection by the defense.

¶ 27    Stephanie Sessions testified that she was a registered nurse and currently worked in the emergency room at a hospital in Mattoon, Illinois. Prior to her current employment, Ms. Sessions worked in the same capacity at Carle Richland Memorial Hospital. As part of her employment, she was trained to conduct sexual assault nurse examiner examinations as a SANE in Illinois. As such, the State of Illinois allowed her to complete sexual assault examinations of children.

¶ 28    On September 9, 2019, Ms. Sessions conducted a SANE examination of A.I. Natalie Isham, A.I.'s mother, was also present during most of the examination, although Ms. Sessions spent a short amount of time with only A.I.

10

¶ 29    First, A.I. told Ms. Sessions that the defendant forced her into the bathroom, touched her in her private area, and attempted to have her perform oral sex on him. At some point, Kimberly opened the bathroom door and stopped the activity. Based on this information, Ms. Sessions collected a buccal swab and blood standard card from A.I. and placed them in a sexual assault kit. A.I. said that she did not have any physical injuries. Ms. Sessions did not perform a pelvic exam or observe any injuries on A.I. Later that day, she gave the kit to Deputy Chase Cheadle from the Wabash County Sheriff's Office.

¶ 30    Jennifer Mulrean testified that she was a forensic scientist with the Illinois State Police (ISP). She examined swabs taken from A.I.'s underwear as well as a blood standard and oral swabs from A.I.'s sexual assault kit. She was able to identify one major female DNA profile. A.I. "could not be excluded from the major female profile." A minor male DNA profile at a single locus was also found. When Ms. Mulrean compared that profile to the defendant's buccal swab sample that had been provided, the defendant's swab had the same profile at that single locus, as would one in two random males. Ms. Mulrean found no male DNA on the oral swabs from the sexual assault kit.

¶ 31    Suzanne Kidd testified that she worked as a forensic biologist for the ISP. She performed a Y-STR analysis on A.I.'s underwear and the defendant's buccal swab. She explained that "Y-STR DNA analysis is a specific type of analysis that only looks at the Y chromosome." The results of that analysis showed a very low presence of Y DNA and indicated that "there could be more than one contributor." Therefore, her "results were inconclusive."

¶ 32    Following Ms. Kidd's testimony, the trial court closed the courtroom to non-interested parties and non-media in preparation for the presentation of the State's other-crimes witnesses. In the court's chambers, outside of the jury's presence, defense counsel stated that he had no objection

11

to the witnesses testifying about the events in the instant case. However, he did now object to the witnesses "testifying as to any other criminal acts that are alleged to have been perpetrated by Mr. Isham against them." He stated, "I brought it up now because in the jury instructions that we propose to give to the Court, in the notes that are attached by the jury instruction statute, one of those instructions indicates that it is not proper for the jury to include crimes of [*sic*] other evidence regarding propensity especially." In response, the State noted to the court that the other-crimes evidence "was the subject of a motion filed January 10, 2020, *** and upon which you ruled on July 29, 2020."

¶ 33    Defense counsel then asked the court to "reconsider" its earlier order which allowed the proposed other-crimes evidence. He argued that after having heard the "rest of the evidence of this trial," he did not "believe the Court is going to hear anything from these two minors that will tie into a certain time frame or a certain occurrence or matching events, such as pulling someone allegedly into a bathroom, grabbing them by their hair." He further argued that there were no similarities between the proposed evidence and the instant matter but "the prejudice to the defendant is great." He opined that the prejudice should not be allowed to taint the jury pool "in looking at whether or not this has happened on other occasions with other people."

¶ 34    The court again found that the proximity in time and similarities between the other-crimes evidence to the charged offense weighed in favor of admitting the evidence. However, "after hearing the evidence so far," the court also found "the probative value does not outweigh the danger of unfair prejudice." The court thereafter barred the State from presenting the testimony of the witnesses pertaining to what the defendant allegedly did to them. They could testify only to what they witnessed pertaining to the charged offense. The court also ruled that the jury should continue to receive the other-crimes evidence instructions due to the "statements made by [A.I.]

12

in the forensic interview, as well as statements made on the witness stand." The trial court and the attorneys returned to the courtroom, and the proceedings continued in front of the jury.

¶ 35    The State then called B.I. as a witness. After the court found her to be of such maturity as to be able to answer questions asked of her under oath, B.I. then testified she was 10 years old and in the fourth grade. She currently lived with Angela and Phil, along with a number of other children, including R.I. Her father was the defendant and her mother was Kimberly. She used to live with her parents and siblings, R.I. and D.I.

¶ 36    B.I. was "like seven years old" the last time her cousins, including A.I., were at her old house. The weather was sunny that day. She thought she had not gone to school so it must have been the weekend. The children were watching television and B.I.'s father, the defendant, was also in the house. B.I.'s mother was not home at the time because she had gone to her grandfather Harold's house across the street to help him because he recently had a stroke. The defendant came into the living room where the children were watching television "and he kind of dragged my cousin, [A.I.], into the bathroom with him." B.I. heard A.I. screaming while A.I. was in the hallway between her parents' room and her room. She saw the defendant and A.I. enter the bathroom. The defendant "slammed the door and locked it." A.I. was crying. She and her brothers took A.I.'s little brothers "and ran to my grandpa's house to get my mom for help." When B.I. told Kimberly that the defendant had taken A.I. "and locked her with him in the bathroom," Kimberly told B.I. to stay at Harold's house. Kimberly then "ran over there as fast as possible." Sometime after the incident, B.I. stayed at A.I.'s house for a couple weeks.

¶ 37    On cross-examination, defense counsel asked B.I., "you don't know what happened in the bathroom, do you?" B.I. stated that she did not. Defense counsel then asked B.I., "And are you

13

sure that [D.I.] was with you in the house or was [D.I.] over taking care of Grandpa?" B.I. answered, "Well I'm pretty sure he was over taking care of my grandpa."

¶ 38 The State's last witness was D.I. After the court found him to be of such maturity as to be able to answer questions asked of him under oath, D.I. testified he was 13 years old and enjoyed school. He currently resided in a residential home in Manteno, Illinois, but "also live[d] with my foster Mom, Angela" who lived in East Alton, Illinois. When he lived with Angela, his siblings, R.I. and B.I., also lived there. D.I.'s parents were the defendant and Kimberly. Until he was 11 years old, he lived with them and his siblings in Keensburg. His maternal grandfather, Harold, lived across the street. When he lived in Keensburg, his cousins, A.I., J.I., and Ja. I., would sometimes visit. Their father was Jacky, the defendant's brother.

¶ 39 The last time D.I.'s cousins visited his house in Keensburg, "[i]t was a sunny day. It was a really nice day, beautiful." When they first came over, D.I. had just gotten out of school. D.I. confirmed that it was a weekday. D.I. had been spending nights with Harold for a week or two to help him after he suffered a stroke. D.I. had left his homework from the day before at his house and needed to retrieve it.

¶ 40 When D.I. got to his house to retrieve his homework, A.I. was in the living room at one end of the couch. A.I.'s two siblings were in one seat together. D.I.'s brother was in the defendant's chair and his sister was in Kimberly's chair. The group was watching television. The defendant was in the house but D.I. did not remember where. Kimberly was not there; she was at Harold's house. While D.I. was in the living room, he turned his back for a moment to look out the front door. When he turned back around, A.I. was no longer in the room. He also did not see the defendant. D.I. looked around and saw that the bathroom door was closed. He then heard A.I. crying and it sounded like her crying was coming from the bathroom. D.I. could see that someone

14

was in the bathroom because he could see a shadow moving around under the door. He then went into "a panic mode." The younger children started to cry. B.I. and R.I. seemed like they did not know what was going on. He and R.I. went across the street to get Kimberly. B.I. did not go with them. When he got to Harold's house, D.I. told Kimberly that A.I. "was in the bathroom crying, and I didn't know what—I didn't know what happened." Kimberly then left Harold's house and went back to her house. D.I. stayed at Harold's house. He did not see or talk to A.I. or the defendant after that because he stayed with Harold the rest of the night.

¶ 41    At the conclusion of D.I.'s testimony, the State rested. After a recess for lunch, the defense presented no evidence and rested.

¶ 42    In closing, the State argued, *inter alia*:

> "I stood before you at jury selection. And I asked the question: Would you have a difficult time finding the defendant guilty because there's not conclusive DNA evidence? No one raised their number. And that's what we have. The DNA evidence is not conclusive, but it's not inconsistent. The DNA expert said he's included. He's not excluded. But it's [*sic*] at one location. *** It's not inconsistent.
>
> * * *
>
> *** Jacky and Natalie Isham believed their daughter."

¶ 43    Defense counsel argued that the evidence was insufficient to convict the defendant, noting that A.I. told Ms. Turner that she was wearing blue jeans when the alleged touching occurred yet testified first that she was wearing shorts and then testified that she was wearing blue jean shorts. He further argued that it did not "make any common sense for someone to do that with that many people in the home." He then asked, "Now, does it seem to make sense that Jeff would do this knowing that Kim is right across the street and likely to come home at any minute?" Defense

15

counsel argued that it was odd that both B.I. and D.I. described the date of the offense as being "sunny" and that all the children used the same word, "siblings," when they testified. He opined, "We have a little girl getting yelled at for walking in the bathroom. And we have a little girl that's made up a story here."

¶ 44 At the conclusion of closing arguments, the trial court admonished and instructed the jury. It stated that opening statements and closing arguments were not evidence and "any statement or argument made by the attorneys which is not based on the evidence should be disregarded." It further instructed the jury, *inter alia*:

> "Evidence has been received that the defendant has been involved in offenses other than those charged in the information. This evidence has been received on the issue of the defendant's identity, motive, intent, common scheme or design, *modus operandi*, lack of consent and propensity and may be considered by you only for that limited purpose.

> It is for you to determine whether the defendant was involved in these offenses and, if so, what weight should be given to this evidence on the issues of the defendant's identity, motive, intent, common scheme or design, *modus operandi*, lack of consent and propensity."

After deliberation, the jury found the defendant guilty of predatory criminal sexual assault. The trial court ordered that a presentence investigation report (PSI) be prepared by the probation department and set the matter for sentencing.

¶ 45 The PSI was filed with the court on January 4, 2022, and an addendum to the PSI was filed on January 5, 2022. The PSI indicated that the defendant had a criminal history consisting of, *inter alia*, domestic battery convictions in 2011 (one count), 2013 (one count), 2018 (two counts),

16

and 2019 (one count). It further indicated that the defendant "did not identify with any cognitive distortions that support the sexual abuse of children" and he had an average risk of re-offending. The defendant successfully completed a term of probation in Wabash County case No. 07-CM-250.

¶ 46    On February 14, 2022, the trial court conducted the sentencing hearing. Shauna Smith testified that she had counseled A.I. in trauma-focused therapy since March 2020. A.I. was diagnosed with "[u]nspecified trauma and stressor-related disorder," which Ms. Smith attributed to the incident with the defendant. The State submitted victim impact statements from A.I. and Natalie.

¶ 47    The State asked the court to consider in aggravation that (a) the defendant's conduct caused or threatened serious harm, (b) the defendant had a history of prior delinquency or criminal activity dating back to 2007, (c) the sentence was necessary to deter others from committing the same crime, and (d) the defendant held a position of trust or supervision over A.I. The State also asked the court to consider that "[t]he crime was done forcefully" and that the defendant's prospect for rehabilitation was low which was shown by "his failure to acknowledge and accept responsibility." The State requested that the defendant be sentenced to 45 years' incarceration.

¶ 48    In mitigation, defense counsel argued that the defendant was found not to have a high risk of re-offending, he "did not threaten or did not contemplate any physical harm," and the circumstances were unlikely to recur. He further argued that the defendant acted responsibly by marrying Kimberly when she got pregnant in high school and maintained consistent employment. Counsel did not ask for a specific sentence, but, rather, asked the court to take his argument into consideration and sentence the defendant accordingly. In allocution, the defendant stated that the jury was "gravely mistaken," he was not guilty and would "be going to prison as an innocent man,"

and he prayed that the judge and jury could bear the burden of having convicted and sentenced "an innocent man."

¶ 49    In delivering its decision, the trial court stated that it considered the evidence at trial, the PSI and its addendum, the defendant's history, character, and attitude, and the evidence and arguments, as well as the victim impact statements and the defendant's statement in allocution, presented at the sentencing hearing. In aggravation, it found the defendant had a history of delinquency or criminality, the sentence was necessary to deter others, and the defendant held a position of trust over A.I. It further found that none of the mitigating factors argued were supported by the evidence. The court ultimately sentenced the defendant to 45 years' incarceration in the Illinois Department of Corrections. After pronouncement of sentence, the court admonished the defendant of his appeal rights.

¶ 50    On February 25, 2022, defense counsel filed a motion to reconsider. The motion argued that the sentence was excessive, greater than the sentence offered by the State before trial, and "oppressive in nature for the crime" for which the defendant was found guilty.

¶ 51    On March 14, 2022, counsel filed a motion to withdraw as attorney, citing the defendant's filing of a *pro se* notice of appeal and need for the appellate public defender to be appointed forthwith "so as to afford timely representation for the Defendant in the future." The appeal proceeded, but this court dismissed it as premature on May 6, 2022. *People v. Isham*, No. 5-22-0120 (2022) (unpublished order).

¶ 52    On August 30, 2022, the trial court conducted the hearing on the motion to reconsider. The defendant was represented by new counsel. Defense counsel argued the defendant was subjected to "a trial tax," in that he received a sentence greater after trial than the State's initial offer to him of probation and its subsequent offer of 28 years' incarceration for his guilty plea and/or a cap of

18

30 years' incarceration if he made an open plea of guilty. The State argued that there was no "trial tax" on the defendant and that the sentence previously imposed by the court was "very well pronounced." The trial court noted that it made clear at the 402(d) conference that it would not entertain a sentence of probation and that it never heard the State's subsequent offer. It further noted that it was not the State "that gets to impose the sentence," but "the Court that imposes the sentence after hearing all the evidence and following the law and hearing matters in aggravation and mitigation." The court found no reason to modify the defendant's 45-year prison sentence and denied the motion. The defendant now appeals.

¶ 53                                 II. ANALYSIS

¶ 54                        A. Sufficiency of the Evidence

¶ 55    The defendant first argues that the State failed to prove him guilty of predatory criminal sexual assault of a child beyond a reasonable doubt. He avers that the State's evidence was incredible, uncorroborated, and contrary to human experience. He asserts that the conviction rested almost exclusively on A.I.'s testimony. The defendant argues that only B.I.'s testimony corroborated A.I.'s testimony and B.I. had a motive in securing the defendant's conviction. He further argues that D.I.'s testimony undermined A.I.'s testimony as he testified that he did not see the defendant drag A.I. into the bathroom and he did not testify that he heard her yell. The defendant opines that it seems impossible that he could have entered the living room, grabbed A.I. from the couch, and dragged her into another room by her hair in the brief time D.I. turned around without D.I. hearing anything unusual.

¶ 56    The defendant further argues that the child witnesses in the case had the opportunity to discuss their stories with one another before trial as B.I. lived with A.I.'s family for a few weeks after the incident occurred. He avers that D.I. and B.I. also could have talked to each other, which

19

would have allowed D.I. to try to conform his testimony to support A.I. The defendant argues that B.I.'s and D.I.'s testimonies were inconsistent with one another in that they did not agree on whether the incident occurred on a weekday or a weekend day or who went to retrieve Kimberly. He further avers that it was odd that both B.I. and D.I. described the day of the incident as being "sunny," which supported an inference that they tried to match their testimonies. The defendant argues that A.I. provided a third account when she stated that all the children were present in the front room after Kimberly opened the bathroom door, which contrasted with B.I.'s and D.I.'s testimonies that they stayed at Harold's house after Kimberly was alerted and left. The defendant argues that A.I.'s testimony at trial was impeached by her own first statement to Kimberly describing the events when she testified that the defendant first tried to put his penis into her mouth before putting his finger in her vagina while she had first told Kimberly only that the defendant pulled her by the hair and put his finger in her vagina.

¶ 57    The State argues that the evidence was sufficient. It avers that A.I.'s testimony and her recorded interview were "remarkably consistent." It further argues A.I. calmly and in detail described what happened and her depiction of the events never changed. The State notes that A.I. also told Ms. Sessions, the emergency room nurse, the same version of events.

¶ 58    The State argues that B.I.'s testimony corroborated A.I.'s testimony in that B.I. testified that she actually observed the defendant pull A.I. into the bathroom and heard A.I. scream and cry. It further argues that D.I.'s testimony also corroborated A.I.'s testimony in that D.I. testified that he noticed that A.I. disappeared from where she had been sitting and he heard her crying from inside the bathroom. The State opines that no rational jury would have believed that A.I. merely walked in on the defendant in the bathroom. It further opines that, logically, if A.I. had walked in on the defendant, she would have quickly exited the bathroom, and the other children would not

20

have needed to retrieve Kimberly to defuse the situation. The State avers that the inconsistencies pointed out by the defendant are trivial and did not taint A.I.'s overall credibility.

¶ 59　When addressing claims of insufficient evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *People v. Smith*, 185 Ill. 2d 532, 541 (1991). Section 11-1.40(a)(1) of the Criminal Code of 2012 provides:

> "(a) A person commits predatory criminal sexual assault of a child if that person is 17 years of age or older, and commits an act of contact, however slight, between the sex organ or anus of one person and the part of the body of another for the purpose of sexual gratification or arousal of the victim or the accused, or an act of sexual penetration, and:
>
> (1) the victim is under 13 years of age[.]" 720 ILCS 5/11-1.40(a)(1) (West 2018).

¶ 60　" 'A conviction can be sustained upon circumstantial evidence as well as upon direct, and to prove guilt beyond a reasonable doubt does not mean that the jury must disregard the inferences that flow normally from the evidence before it.' " *People v. Patterson*, 217 Ill. 2d 407, 435 (2005) (quoting *People v. Williams*, 40 Ill. 2d 522, 526 (1968)). "Testimony of a complainant must either be clear and convincing or substantially corroborated to support a conviction, although there is no requirement that it be crystal clear or perfect." *People v. Robertson*, 168 Ill. App. 3d 132, 136 (1988). "Where minor inconsistencies or discrepancies exist in a complainant's testimony but do not detract from the reasonableness of her story as a whole, the complainant's testimony may be found to be adequate to support a conviction for sexual abuse." *People v. Soler*, 228 Ill. App. 3d 183, 200 (1992).

¶ 61    Here, the defendant only contested that contact occurred. With only minor discrepancies, A.I.'s version of events, *i.e.*, that the defendant placed his finger in her vagina, remained the same when she told Kimberly, her parents, Ms. Sessions, and Ms. Turner. Moreover, A.I.'s testimony in court remained consistent with what she told others shortly after the events occurred. Additionally, we find that both B.I.'s and D.I.'s testimonies corroborated A.I.'s testimony even if they did not perfectly mirror each other's testimony. Both testified that A.I. was originally sitting in the living room, disappeared from that spot, and was heard crying in the bathroom, the defendant was in the house, and Kimberly was summoned. We find that when viewing the evidence in the light most favorable to the State, the jury rationally could have found beyond a reasonable doubt that the essential elements of predatory criminal sexual assault of a child existed in this case.

¶ 62                                        B. *Voir Dire*

¶ 63    The defendant next argues that the trial court committed plain error by violating Rule 431(b) when it failed to ask any of the jurors if they "accepted" that a criminal defendant is presumed innocent of the charges against him. He avers that this was a closely balanced case. He further argues that the State's case hinged on A.I. and its evidence was so weak that no rational trier of fact could have found him guilty. The defendant opines that even if this court finds the evidence was not fantastical, the case was closely balanced where the testimonies of B.I. and D.I. offered divided support, A.I. and B.I. had a potential motive to fabricate the allegations, and A.I. was inconsistent about what occurred in the bathroom. He asserts that the physical evidence was also closely balanced in that there was only a 50% chance that the male DNA found on A.I.'s underwear could have come from him.

¶ 64    The State argues that there was no error as the trial court substantially complied with Rule 431(b). It avers that the record is clear that the trial court informed the entire venire that it needed

22

to ascertain whether they understood and "accepted" all four of the Rule 431(b) principles, including the principle that a defendant is presumed innocent. The State argues in the alternative that if this court finds error occurred, the error did not rise to plain error. It asserts that the evidence was not closely balanced. It further argues that A.I. was an overwhelmingly consistent and credible witness and the other testimony supported her testimony.

¶ 65    To preserve errors for review, a defendant must both object at trial and include any alleged errors in a written posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). "[T]he plain-error doctrine bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved error when either (1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence." *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005). A defendant bears the burden of persuasion under each prong of the plain error doctrine. *People v. Morris*, 2013 IL App (1st) 110413, ¶ 82. Where plain error is not established, the reviewing court must honor the procedural default. *People v. Keene*, 169 Ill. 2d 1, 17 (1995). Here, the defendant acknowledges that he did not preserve the alleged Rule 431(b) error and asks for first-prong plain error review.

¶ 66    The first step in a plain error analysis is to determine whether a clear, obvious error occurred. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). "The trial court must ask each potential juror whether he or she understands and accepts each of the principles in" Rule 431(b). *People v. Thompson*, 238 Ill. 2d 598, 607 (2010). "The questioning may be performed either individually or in a group, but the rule requires an opportunity for a response from each prospective juror on their understanding and acceptance of those principles." *Id.*

¶ 67    In *People v. Morris*, 2013 IL App (1st) 110413, ¶ 80, the trial court told the prospective jurors as a whole that they must "understand" and "embrace" each of the four principles, including

23

the presumption of the defendant's innocence. It then stated the four principles. *Id.* Next, for each principle, it asked the panel if there was "anybody in the courtroom who disagrees with this fundamental principle of law?" *Id.* The appellate court found that the trial court complied with Rule 431(b) even though it did not ask if the panel "accepted" each principle when it "told the venire that it was essential that they all 'understand' and 'embrace' the four principles." *Id.* ¶ 83.

¶ 68    We find the case now before us to be quite similar to *Morris*. In this case, the trial court at the outset asked the potential jurors, *inter alia*, if they "understand and accept that the defendant is presumed to be innocent of the charge against him" and if there was "anyone in the group who does not understand this proposition." Like the reviewing court in *Morris*, although the trial court did not specifically ask if the venire members "accepted" the principle, it did advise them that they must understand and accept the principle at the outset. Therefore, we find the trial court here complied with Rule 431(b) and did not err. Thus, we honor the procedural default.

¶ 69                    C. Ineffective Assistance of Counsel

¶ 70    The defendant next contends that he received ineffective assistance from trial counsel. He argues that counsel was ineffective because he allowed the jury to consider (a) extended hearsay discussion of other-crimes evidence that the court ultimately deemed inadmissible, (b) evidence that the defendant's children had been placed in foster care, (c) evidence that A.I.'s parents believed her allegations, and (d) argument in which the State suggested that allowing the absence of corroborating physical evidence to influence their verdict would violate promises the juror made during jury selection. The defendant avers that counsel's deficient performance prejudiced him because it "was premised on a mountain of improper evidence due to counsel's failures."

¶ 71    The State concedes that defense counsel's performance was deficient regarding the other-crimes evidence. However, it argues that the defendant cannot establish ineffective assistance of

24

counsel because he has not established how counsel's representation prejudiced him. It avers the evidence was overwhelming and the outcome of the trial would not reasonably have been different absent counsel's deficient performance.

¶ 72    A defendant is denied effective assistance of counsel when counsel's performance is deficient and the deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *People v. Caffey*, 205 Ill. 2d 52, 105 (2001). A defendant's failure to establish either prong is fatal to the claim. *Caffey*, 205 Ill. 2d at 106. Notably, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691.

¶ 73    In this case, we find that we are able to dispose of the defendant's claim of ineffective assistance of counsel on the prejudice prong. As stated earlier, A.I. remained consistent with her version of the events as rendered to Kimberly, her parents, Ms. Turner, and Ms. Sessions. This consistency remained at trial through A.I.'s testimony. Moreover, as we earlier found, both B.I.'s and D.I.'s testimonies corroborated A.I.'s version of events. Taking all this evidence into account, we find the evidence was overwhelming such that any prejudice resulting from defense counsel's alleged inadequate performance was not of a magnitude that the outcome of the trial would reasonably have been different without the error. Therefore, the defendant's claim of ineffective assistance of counsel also fails.

¶ 74              D. Constitutionality of Defendant's Sentence

¶ 75    The defendant next argues that his sentence for predatory criminal sexual assault of a child violates the proportionate penalties clause and is thus unconstitutional because the offense shares identical elements with the offense of aggravated criminal sexual abuse. He avers that both statutes require sexual contact for the purpose of sexual gratification or arousal between an individual who

25

is 17 years of age or older and an individual who is under 13 years of age, but the predatory criminal sexual assault offense has a higher sentencing range. The defendant asserts that his conduct satisfied the elements of both offenses and, as a result, this court should reduce his conviction for predatory criminal sexual assault of a child to aggravated criminal sexual abuse and remand the case for a new sentencing hearing. The State counters that the defendant's sentence for predatory criminal sexual assault of a child does not violate the proportionate penalties clause because the offense does not share identical elements with the offense of aggravated criminal sexual abuse.

¶ 76    "The constitutionality of a statute is a question of law, which we review *de novo*." *People v. Johanson*, 2024 IL 129425, ¶ 9. Our supreme court in *Johanson* recently settled the question of whether the offense of predatory criminal sexual assault of a child contains identical elements to the offense of aggravated criminal sexual abuse in the negative. *Id.* ¶ 14. Specifically, it found "the two offenses do not contain identical elements" and "[t]herefore, the more severe sentence provided for the offense of predatory criminal sexual assault of a child is not constitutionally disproportionate to the less severe sentence for the offense of aggravated criminal sexual abuse." *Id.* It then affirmed the appellate court which affirmed the circuit court's determination "that the offense of predatory criminal sexual assault of a child does not contain identical elements to the offense of aggravated criminal sexual abuse and therefore does not violate the proportionate penalties clause of the Illinois Constitution." *Id.* ¶ 20. As the supreme court has already spoken on this issue, we reject the defendant's contention that the predatory criminal sexual assault of a child statute is unconstitutional for violating the proportionate penalties clause.

¶ 77                    E. Sentence

26

¶ 78    The defendant lastly argues that his 45-year sentence was excessive in that it was disproportionate to his offense and did not take into account his rehabilitative potential. He avers that he did not cause physical harm and the contact was fleeting. The defendant argues that nothing about the facts of this case warranted a sentence almost 40 years over the minimum. He opines that any doubt about the disconnect between his conduct and the sentence imposed is reflected by the fact that the State made two offers before trial that were drastically less severe than the sentence imposed.

¶ 79    The defendant argues, in addition to the mitigating factors, that his conduct was the result of circumstances unlikely to recur, he did not contemplate his actions would cause serious consequences, and there was other compelling evidence overlooked by the court. He opines that his parents were disabled, he attended school through the ninth grade when he left school to gain employment when Kimberly became pregnant, and he maintained steady employment despite his physical and emotional issues. He further opines that he was "clearly committed to making sure his family was financially secure, even at the expense of his own education." The defendant further argues that the trial court ignored the information in his PSI that indicated that he did not identify with any cognitive distortions that supported the sexual abuse of children, and he was not found to have a high risk of re-offending.

¶ 80    The defendant argues that there were ways to protect the public other than imprisoning him for the rest of his life. He avers that he would be required to register as a sexual predator, the public would be notified of his criminal history, local authorities would monitor him, and he would be subject to a period of mandatory supervised release for at least three years upon his release from any prison sentence.

¶ 81    The defendant contends that none of the aggravating factors cited by the trial court warranted his sentence. He argues that his prior criminal convictions for domestic battery did not warrant a sentence of 39 years over the minimum. He further argues that deterrence likewise did not justify keeping him imprisoned for almost the rest of his life. He avers that the public would already be deterred where the offense is punishable as a Class X felony and he would have to register as a sexual predator for the rest of his life. He also argues that the court's reference that the defendant abused a position of trust or supervision he held over A.I. was not so egregious to warrant such an extreme punishment.

¶ 82    The State argues that the trial court did not abuse its discretion when sentencing the defendant. It avers the PSI revealed the defendant was at an average risk of re-offending. It opines that because of the defendant's actions, A.I. expressed in her victim impact statement that she felt "scared and anxious around [men]" and that the defendant "took something from" her that she "can never get back," and that she blamed herself for what happened.

¶ 83    The State further argues that the defendant's offense was very serious, terrified A.I. who trusted him, and changed A.I.'s life forever. It further contends that the defendant's four domestic battery convictions indicate that he has an issue of committing violence against family members. The State opines that the need for deterrence was properly considered by the court where the crime was "disgusting and heinous, and a strong sentence was needed to show others that such despicable sexual acts upon kids and family members will not be looked upon lightly." The State further argues that one of the most significant factors justifying the defendant's sentence was his lack of remorse as shown by his statement in allocution. The State also notes that the defendant's 45-year sentence was well within the 6- to 60-year sentencing range.

¶ 84 A trial court's sentencing decision is entitled to great deference *People v. Coleman*, 166 Ill. 2d 247, 258 (1995) "A sentence within the statutory limits will not be disturbed absent an abuse of discretion." *Id.* An abuse of discretion occurs " 'where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court.' " *People v. Sutherland*, 223 Ill. 2d 187, 272-73 (2006) (quoting *People v. Hall*, 195 Ill. 2d 1, 20 (2000)). The onus is upon the trial court to impose a sentence that strikes the appropriate balance between protecting society and rehabilitating the defendant. *People v. Caballero*, 237 Ill. App. 3d 797, 810 (1992). However, the seriousness of the crime committed is the most important factor for the court to consider when it fashions an appropriate sentence. *People v. Tye*, 323 Ill. App. 3d 872, 890 (2001). Moreover, a sentencing court is not obliged to afford a defendant's rehabilitative potential more weight than the seriousness of the offense committed. *Coleman*, 166 Ill. 2d at 261. "[T]he mere fact that the defendant was given a greater sentence than that offered during plea bargaining does not, in and of itself, support an inference that the greater sentence was imposed as a punishment for demanding trial." *People v. Carroll*, 260 Ill. App. 3d 319, 348-49 (1992). "Instead, this disparity may simply reflect an inducement offered to defendant to plead guilty in exchange for a sentence less than that which is ordinarily warranted, which is not improper." *People v. Walker*, 2021 IL App (4th) 190073, ¶ 68. Moreover, "trial courts have the right to impose a greater sentence after trial than at the time of a guilty plea." *People v. Peterson*, 311 Ill. App. 3d 38, 53 (1999). Importantly, "[t]he defendant's conduct during trial may give the judge insights into his moral character and suitability for rehabilitation." *Alabama v. Smith*, 490 U.S. 794, 801 (1989). Moreover, "after trial, the factors that may have indicated leniency as consideration for the guilty plea are no longer present." *Id.*

¶ 85 Here, the imposed sentence was well within the statutory limits. The offense committed was very serious and resulted in long-term harm to A.I. Moreover, as pointed out by the State, the defendant showed no remorse for his actions, he had an average risk of re-offending, and he had a significant criminal history involving family members as his victims. This evidence indicates that the defendant's rehabilitative potential is not as high as he would like to portray. We cannot say that the court abused its discretion when it sentenced the defendant to 45 years' imprisonment for predatory criminal sexual assault of a child.

¶ 86                                III. CONCLUSION

¶ 87 For the foregoing reasons, we find that (a) the State proved the defendant guilty beyond a reasonable doubt of predatory criminal sexual assault, (b) the trial court did not violate Illinois Supreme Court Rule 431(b), (c) the defendant did not receive ineffective assistance of counsel, (d) the predatory criminal statute does not violate the proportionate penalties clause and, thus, is not unconstitutional, and (e) the trial court did not abuse its discretion when it sentenced the defendant. Therefore, the defendant's conviction and sentence are affirmed.

¶ 88 Affirmed.

¶ 89 PRESIDING JUSTICE McHANEY, dissenting:

¶ 90 I respectfully dissent. The State charged the defendant with a single count of predatory criminal sexual assault against his 11-year-old niece, A.I., alleging that on September 8, 2019, the defendant made contact with A.I.'s vagina with his hand for the purposes of sexual gratification. The defendant was appointed a public defender. At trial, a videotaped forensic interview was published to the jury in which A.I. discussed the charged events as well as sexual acts that the defendant's daughter, B.I., told A.I. that the defendant had done to her. The jury found the defendant guilty, and the trial court sentenced him to 45 years in prison.

30

¶ 91    Prior to trial, the State filed a motion pursuant to section 115-7.3 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-7.3 (West 2018)), to admit other-crimes evidence regarding criminal sexual conduct of the defendant against his three minor children. Specifically, the State indicated it would introduce evidence from: (1) the defendant's oldest child, D.I., that the defendant had attempted to place his penis in the child's mouth; (2) the defendant's second child that the defendant had asked if the child "wanted to suck his private"; and (3) the defendant's youngest child, B.I., that her dad did something to her on more than one occasion since she was five years old, including "S E X" and placing his penis in her mouth. The State argued this evidence was relevant to prove identity, intent, motive, common scheme or design, lack of consent, *modus operandi*, and propensity. The record does not indicate that defense counsel filed a response, nor did defense counsel respond to the State's supplement to the motion. The trial court granted the State's motion, finding the proximity in time of the other crimes and the factual similarity to the charged offense were sufficiently probative to outweigh their prejudice.

¶ 92    On October 28, 2018, a videotaped forensic interview of A.I. by Ashleigh Turner, a social emotional behavioral assistant for the school district, was tendered to the defense in discovery. On July 22, 2021, the State provided notice of its intent, pursuant to section 115-10, to introduce multiple out-of-court statements made by A.I., including those made during the videotaped forensic interview. Once again, defense counsel did not object. The trial court requested to review the reports documenting the prior statements as well as the forensic interview summary. It asked if there were only particular statements that would be submitted or if the State would introduce the forensic interview in whole. The State indicated, with confirmation from defense counsel, that the entire interview would be introduced. The trial court found the statements provided sufficient safeguards of reliability to be admitted.

31

¶ 93    In its opening statement, the State told the jury:

"This case is about a family secret. It's a family secret that was kept within [the defendant] and [his wife] Kimberly Isham's immediate family for some time. And that family secret was that the defendant was a child sexual predator that put his sexual desires before his duty to protect children in his care.

And the only reason we're here discussing the secret, the only reason you're going to hear about this secret is because the defendant acted on his sexual impulses and attacked a child that was outside of his immediate family. And that child was [A.I.], age 11, the defendant's niece."

¶ 94    A.I. testified that she lived with her parents and three siblings, and the defendant was her uncle. A.I. would go to the defendant's house to spend time with her cousins. The last time she and her family went to the defendant's house was around two years earlier, when A.I. was 11 years old. Her parents, Jacky and Natalie, left the defendant's house later that night for a date night. Her aunt, Kimberly, left the house to go to A.I.'s grandpa's house. At that point, A.I., her siblings, and her cousins were watching TV. A.I. testified that the defendant pulled her into the bathroom by her ponytail. The defendant tried to put his penis in A.I.'s mouth. A.I. covered her mouth and told him "no." The defendant pulled her pants and underwear down and put his finger in A.I.'s vagina. A.I. testified she was scared. She stated her aunt, Kimberly, stopped the act by opening the bathroom door. Later, Kimberly asked A.I. questions. When A.I. told her parents what happened, her parents believed her, and they took her to the police station. On cross-examination, A.I. stated that she believed Kimberly accused her of walking in on the defendant while he was in the bathroom. On redirect examination, A.I. stated that Kimberly had sent a message to her parents indicating A.I. walked in on defendant in the bathroom.

32

¶ 95    Dru Faulkner, a 911 dispatcher, testified her records showed that Jacky and Natalie Isham came to the station with A.I. on September 9, 2019, at 12:43 a.m. D-Ray Etzkorn, a deputy with the Wabash County Sheriff's Department, testified he took a report from Jacky and Natalie Isham on September 9, 2019. They had advised him their daughter had said she was molested by her uncle, Jeffery Isham. Keagan Bogard, a former Wabash County Sheriff's deputy, went to A.I.'s home after having been assigned this investigation and collected the underwear the child was wearing at the time of the incident.

¶ 96    At this point, the State indicated it intended to introduce the videotaped forensic interview of A.I. by Turner. Defense counsel did not object. The unredacted video was published to the jury and admitted as an exhibit. In the interview, Turner asked A.I. why she had come to talk to Turner. A.I. said that the prior night, the defendant had pulled her by her hair into his bathroom, while she tried to hold onto the wall and yelled at him to stop. In the bathroom, he pulled down his shorts and tried to put his private in her mouth. When A.I. put her hand over her mouth, the defendant turned her around, pulled down the back of her pants, and put his finger "up [her] private," which felt "weird" and hurt a little bit. A.I. yelled and told the defendant to stop. Her cousins, R.I. and B.I., went to get their mother from "Harold's" house. Eventually, Kimberly opened the door. While the defendant first tried to shut the door and continue, he eventually stopped, and Kimberly told A.I. to get out.

¶ 97    Subsequently, Kimberly took A.I. outside and asked what they were doing. A.I. only told her that the defendant had dragged her by her hair and put his finger inside her private; she forgot about the rest. Kimberly said "okay" and went back inside. After Kimberly went inside, the defendant's daughter, B.I., told A.I. what her father does to her. According to A.I., B.I. told her that he would have B.I. suck his private, pee in her mouth, and force her to drink it. He would also

33

put his private in B.I.'s butt and private. A.I. confirmed that B.I. was the defendant's eight-year-old daughter, and she said again that B.I. told her that the defendant made her suck his private until he peed in her mouth, made her drink it, and also put his private in her butt and private. Turner asked A.I. if the defendant did this to B.I. a lot. A.I. did not know, but she thought he did "because he lives with her all the time." Turner asked how B.I. appeared when she was telling A.I. about this. A.I. stated that B.I. looked like she was telling the truth. Asked if B.I. stated whether she told her mom or anyone else, A.I. said that she thought B.I.'s mom knew, as A.I. believed B.I.'s mom would stop it, but the defendant kept on doing it. A.I. then confirmed again that B.I. had told her that the defendant made her suck his private, peed in her mouth, made her drink it, and put his private into B.I.'s own butt and private. A.I. also confirmed again that she thought the defendant's wife tried to stop it, but the defendant kept doing it.

¶ 98   After a short break, Turner asked A.I. more clarifying questions, and A.I. stated that she had been sitting in the front room watching television with her siblings and two of her cousins, B.I., and R.I., when the defendant walked into the room and grabbed her. The other kids saw him grab her and heard her screaming, which led R.I. and B.I. to run to their grandfather's house to get Kimberly. Turner later asked A.I. what she thought about what B.I. had told her. A.I. said she thought how bad that would be. Asked how this made her feel about the defendant, A.I. said that she was mad at him, both for what he did to her and to B.I.

¶ 99   Stephanie Sessions, a registered emergency room nurse at Carle Richland Hospital, treated A.I. on September 9, 2019. A.I. told Sessions her uncle had forced her into the bathroom, touched her private area, and tried to have A.I. perform oral sex on him. A.I. said her aunt stopped what was happening.

34

¶ 100    Keia Tate, a forensic scientist at the Illinois State Police Crime Lab in Belleville, testified that she received and examined the victim's underwear recovered in this case. Jennifer Mulrean, a forensic scientist at the metro east forensic science lab in Belleville, testified that a minor male DNA profile was detected in one location of the victim's underwear. Mulrean testified that comparison testing between that male DNA profile in the underwear and the defendant's DNA standard showed the defendant "was included in that minor male profile," meaning he could have provided that evidence, as "one in two" random people who could have provided the partial profile recovered from the underwear. Suzanne Kidd, a forensic biologist at the Illinois State Police crime lab, testified that the stain in the underwear contained a very low level of male DNA, which indicated there could be more than one contributor, rendering the test results inconclusive.

¶ 101    After the State indicated that it would call the defendant's minor daughter, B.I., the trial court closed the courtroom to non-interested parties and non-media in preparation for the State's other-crimes witnesses. For the first time, defense counsel stated that while he had no objection to the defendant's minor children testifying about the charged event, he did object to them testifying about other criminal acts allegedly perpetrated by the defendant against them. Defense counsel asserted, "[I] brought it up now because in the jury instructions that we propose to give to the Court, in the notes that are attached by the jury instruction statute, one of those instructions indicates that it is not proper for the jury to include crimes of other evidence regarding propensity especially. And so I believe that that is a good jury instruction. And I think that we should have a clean record and not show any other crimes at this time."

¶ 102    The State responded that this evidence issue had been addressed before trial and that the trial court had already granted the State's motion to introduce this evidence. Defense counsel asked the trial court to reconsider, arguing that the prejudice to the defendant was great, and defense

35

counsel did not want the jury tainted "in looking at whether or not this has happened on other occasions with other people." The trial court questioned defense counsel on how to reconcile his current objection with the evidence already admitted through A.I.'s testimony "regarding what [B.I.] and [D.I.] told her that happened to them" and through what was disclosed in AI's forensic interview.[1] Defense counsel said there was no evidence that D.I. had made any statements to A.I., and that the jury "can take note of what was said in the video."

¶ 103   The prosecutor argued that defense counsel's current objection put her in a difficult position because she already told the jury in opening statement that it would hear this evidence. She also argued that all the children were around the same age and were family members of the defendant, that the incidents all occurred in the defendant's home, and that the acts were similar in that they involved penis-to-mouth contact and digital penetration. The trial court again found that the proximity in time and similarities between the other-crimes evidence to the charged conduct weighed in favor of admitting the other-crimes evidence; however, "after hearing the evidence so far," the trial court found "the probative value did not outweigh the danger of unfair prejudice." Accordingly, the trial court refused to allow the children to testify about anything allegedly done to them by the defendant, restricting their testimony to what they witnessed on the date of the charged incident. The State asked if the jury could be made aware of the ruling, so it would not be confused as to why the State was not asking the questions it promised in opening. The trial court declined, finding the State's concerns would be addressed through the instruction that opening statements are not evidence. It also ruled that the jury should be given the other-crimes evidence instruction due to the "statements made by [A.I.] in the forensic interview, as well as statements made on the witness stand."

---

[1]A.I.'s in-court testimony did not reference any disclosures from either B.I. or D.I.

¶ 104 The Constitutions of the United States and Illinois guarantee a criminal defendant the right to effective assistance of defense counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. A defendant's claim of ineffective assistance of defense counsel is analyzed under the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984); *People v. Veach*, 2017 IL 120649, ¶ 29. To prevail on a claim of ineffective assistance of defense counsel, "a defendant must show that defense counsel's performance was (1) deficient and (2) prejudicial." *People v. Westfall*, 2018 IL App (4th) 150997, ¶ 61. "Failure to satisfy either prong negates a claim of ineffective assistance of counsel." *People v. Hibbler*, 2019 IL App (4th) 160897, ¶ 88. Whether counsel was ineffective is a mixed question of fact and law. *People v. Peterson*, 2015 IL App (3d) 130157, ¶ 222. "[T]he ultimate question of whether counsel's actions support a claim of ineffective assistance is a question of law that is subject to *de novo* review on appeal." *Id.*

¶ 105 "To establish deficient performance, the defendant must overcome the strong presumption that counsel's action or inaction was the result of sound trial strategy." *People v. Perry*, 224 Ill. 2d 312, 341-42 (2007). "This means the defendant must show that counsel's errors were so serious, and his performance so deficient, that he did not function as the 'counsel' guaranteed by the sixth amendment." *Id.* at 342. The general rule is that defense counsel is presumed to pursue sound trial strategies. *People v. McMillin*, 352 Ill. App. 3d 336, 344 (2004). This presumption of soundness of defense counsel's performance gives way to a finding of deficiency only where no reasonably effective criminal defense attorney, confronting the trial's circumstances, would engage in similar conduct. *Id.*

¶ 106                    A. Other-Crimes Evidence

¶ 107 The defendant contends that defense counsel rendered ineffective assistance by failing to object to prejudicial other-crimes evidence which the trial court ultimately deemed inadmissible.

"The term 'other-crimes evidence' encompasses misconduct or criminal acts that occurred either before or after the allegedly criminal conduct for which the defendant is standing trial." *People v. Spyres*, 359 Ill. App. 3d 1108, 1112 (2005). Other-crimes evidence is generally inadmissible to demonstrate propensity to commit the charged crime. *People v. Donoho*, 204 Ill. 2d 159, 170 (2003). It is not because such evidence is considered irrelevant; rather, "it is objectionable because such evidence has 'too much' probative value." *Id.* (quoting *People v. Manning*, 182 Ill. 2d 193, 213 (1998)). A trial court generally will prohibit the admission of this evidence to protect against the jury convicting a defendant because he is a bad person deserving punishment. *Id.* "Defendant is entitled to have his guilt or innocence evaluated solely on the basis of the charged crime." *Id.*

¶ 108    However, section 115-7.3 of the Code of Criminal Procedure of 1963 provides, in pertinent part, that where a defendant is accused of predatory criminal sexual assault of a child, evidence of the defendant's commission of another offense or offenses may be admissible (*if that evidence is otherwise admissible under the rules of evidence*) and may be considered for its bearing on any matter to which it is relevant. 725 ILCS 5/115-7.3 (West 2018). Under section 115-7.3, evidence that is normally inadmissible, such as hearsay evidence, remains inadmissible. *People v. Childress*, 338 Ill. App. 3d 540, 551 (2003). Thus, section 115-7.3 enables a trial court to admit other-crimes evidence to show a defendant's propensity to commit sex offenses if the requirements of section 115-7.3 are met. *Donoho*, 204 Ill. 2d at 176.

¶ 109    Even where evidence of other crimes is admissible for a permissible purpose, the evidence should be excluded "where the probative value of that evidence is substantially outweighed by the prejudicial effect on defendant's right to a fair trial." *People v. Robinson*, 167 Ill. 2d 53, 62-63 (1995). "Whether the probative value of other-crimes evidence is outweighed by its prejudicial

impact is a determination left to the trial court's discretion, and we will not disturb that decision absent a clear abuse of discretion." *People v. Spyres*, 359 Ill. App. 3d 1108, 1114 (2005).

¶ 110    The defendant argues that defense counsel's representation was deficient where he failed to object to the State's other-crimes evidence before trial. The defendant notes that when defense counsel objected during trial to the State's other-crimes evidence, the trial court reversed its previous ruling, finding that the probative value was outweighed by the danger of unfair prejudice. Thus, the defendant argues, the trial court would have made a similar ruling if defense counsel had objected before trial. Such speculation is unnecessary because effective defense counsel would have initially objected to the other-crimes evidence and argued, minimally, that its prejudicial effect substantially outweighed its probative value. It is ludicrous to argue that trial counsel's decision not to object to this evidence at the first opportunity was trial strategy. The State even concedes this point. The record supports an inference that defense counsel believed the introduction of this evidence was automatic and only discovered that he had the right to object after stumbling onto a jury instruction committee comment that propensity evidence just might be harmful to his client.

¶ 111                              B. Inadmissible Hearsay Evidence

¶ 112    The defendant next argues that defense counsel rendered ineffective assistance by failing to object to inadmissible hearsay testimony in A.I.'s forensic interview video. Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ill. R. Evid. 801(c) (eff. Oct. 15, 2015). Hearsay generally is not admissible unless it falls within a recognized exception.[2] *People v.*

---

[2]See Illinois Rule of Evidence Rule 803 (eff. Sept. 28, 2018), hearsay exceptions regardless of the availability of the declarant.

*Cloutier*, 178 Ill. 2d 141, 154 (1997). "The failure of defense counsel to object to improper and prejudicial hearsay testimony, thereby allowing its admission, may amount to ineffective assistance of counsel." *People v. Griffin*, 2022 IL App (1st) 190499, ¶ 34.

¶ 113   The defendant was on trial for "committ[ing] an act of contact between his hand and the vagina of a female minor," his 11-year-old niece, A.I., on September 8, 2019. In the unredacted forensic interview video, the jury heard extensive hearsay testimony by A.I. regarding allegations made by the defendant's minor daughter, B.I., of the defendant's ongoing criminal sexual conduct against B.I. The defendant contends it was evident from the State's opening statement that the jury was being invited to convict him in the charge against A.I. because it was the only way to stop the "family secret" in the defendant's home. The defendant further contends that the prejudicial hearsay testimony in A.I.'s forensic interview diverted the jurors' attention away from the charged event and made it more likely that the jury would convict him on the grounds that he was a bad person.

¶ 114   The State concedes that defense counsel should have ensured that A.I.'s interview video was redacted because A.I.'s statements regarding what B.I. had told her about what the defendant had done to her was inadmissible hearsay. Nevertheless, the State submits, and the majority concludes, that, despite defense counsel's deficient performance, the defendant cannot establish the prejudice prong of a *Strickland* because the evidence against him was overwhelming.

¶ 115   To establish prejudice, a defendant must show that a reasonable probability exists that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *People v. Evans*, 209 Ill. 2d 194, 219-20 (2004) (citing *Strickland*, 466 U.S. at 694). "Regarding the second *Strickland* prong, a reasonable probability that the result would have been different is a probability sufficient to undermine confidence in the outcome—or put another way, that counsel's deficient

performance rendered the result of the trial unreliable or fundamentally unfair." *Id.* at 220. The defendant must "affirmatively prove" that prejudice resulted from defense counsel's errors, as " '[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.' " *People v. Johnson*, 2021 IL 126291, ¶¶ 54-55 (quoting *Strickland*, 466 U.S. at 693).

¶ 116   The evidence adduced at trial belies the State's contention, and the majority's conclusion, that the evidence against the defendant was overwhelming. B.I. testified that she saw the defendant drag A.I. into the bathroom with him, and her brother, D.I., testified that he noticed the bathroom door was closed and heard A.I. crying. The physical evidence was inconclusive. A.I. was the only witness able to testify as to the defendant's actions in the bathroom on the day in question.

¶ 117   I would find that the defendant was prejudiced by defense counsel's deficient performance when he failed to object to the hearsay testimony in the video or to seek to have the hearsay testimony redacted. In the forensic interview video, the jury heard multiple times the hearsay statements against him that were equally, if not more heinous, than the act charged, *i.e.*, hand-to-vagina contact. In the unredacted video, the jury heard A.I. testify three times that B.I., who was the defendant's eight-year-old daughter, told her the defendant would have B.I. suck his private, pee in her mouth, and force her to drink it. He also would put his private in B.I.'s butt and private. The jury even watched A.I. as she tried to imagine how awful it must be for B.I. to suffer through those acts by her father. I fail to understand how the majority could find that the defendant failed to establish prejudice when, by the time the trial court reversed its original ruling, the jury had already heard the very evidence that the trial court now found was too prejudicial to be considered. Based upon the unique facts of this case, I conclude that defense counsel's failure to object to the egregiously prejudicial hearsay evidence rendered the result of the defendant's trial unreliable or

fundamentally unfair. Accordingly, I would reverse the defendant's conviction and remand for a new trial.

¶ 118   I dissent.